# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## Case No. 24-12662-AA

## Case No. 24-12964-AA

DENNIS SCOTT, ET AL.,

Plaintiffs-Appellees,

v.

CITY OF DAYTONA BEACH, FLA.,

Defendant-Appellant.

## APPELLANT'S INITIAL BRIEF

**ON APPEAL FROM A PARTIAL SUMMARY JUDGMENT
AND FINAL JUDGMENT
MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION
THE HONORABLE WENDY W. BERGER
6:22-cv-2192-WWB-RMN**

Michael H. Kahn, Esquire
MICHAEL KAHN, P.A.
Florida Bar No.: 0241921
482 N. Harbor City Blvd.
Melbourne, FL 32935
(321) 242-2564
*Attorney for Appellant*
*City of Daytona Beach, Florida*

IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

City of Daytona Beach, Fla. v. Scott, et al.          Case No. 24-12662-AA

City of Daytona Beach, Fla. v. Scott, et al.          Case No. 24-12964-AA

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

11th Cir. R. 26.1 requires that a Certificate of Interested Persons and Corporate Disclosure Statement be included with each brief, petition, answer, motion or response filed by any party.

Listed below are the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

1. Berger, Hon. Wendy W., *U.S. District Judge*

2. City of Daytona Beach, Fla., *Defendant / Appellant*

3. Clarke, Kristen, *Assistant Attorney General, United States Department of Justice, Special Litigation Section, Civil Rights Division*

4. Driggers, Chad, *Plaintiff / Appellee*

5. Dunn, Chelsea, *Attorney for Plaintiffs / Appellees*

6. Gross, Benjamin, *City Attorney for Appellant City of Daytona Beach, Fla.*

C-1 of 3

7.   Johnston, Maureen, *Acting Deputy Chief, United States Department of Justice, Special Litigation Section, Civil Rights Division*

8.   Kahn, Michael, *Attorney for Defendant / Appellant*

9.   Marshall, Daniel, *Attorney for Plaintiffs / Appellees*

10.   Michael Kahn, P.A., *Attorney for Defendant / Appellant*

11.   Neelakanta, Sabarish P., *Attorney for Plaintiffs / Appellees*

12.   Norway, Hon. Robert M., *Magistrate Judge*

13.   Rosenbaum, Steven H., *Section Chief, United States Department of Justice, Special Litigation Section, Civil Rights Division*

14.   Rowland, George, *Plaintiff / Appellee*

15.   Scott, Dennis, *Plaintiff / Appellee*

16.   Siegel, Jodi, *Attorney for Plaintiffs / Appellees*

17.   Southern Legal Counsel, Inc., *Attorneys for Plaintiffs / Appellees*

18.   SPN Law LLC, *Attorney for Plaintiffs / Appellees*

19.   United States Department of Justice

20.   Van Erem, Haley, *Trial Attorney, United States Department of Justice, Special Litigation Section, Civil Rights Division*

21.   Willis, Douglas, *Plaintiff / Appellee*

No publicly traded company has an interest in the outcome of this case or appeal.

BY:   /s/ Michael H. Kahn
       Michael H. Kahn, Esquire
       Florida Bar No.: 0241921
       Counsel for Appellant / Defendant

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument for this appeal. This case involves a common subject of regulation by local governments - panhandling - but in a rapidly evolving legal context. In particular, the Supreme Court's recent decision in <u>City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC</u>, 596 U.S. 61 (2022) dramatically changed the legal landscape in which such challenges are to be evaluated. Whether panhandling laws are treated as content-based or content-neutral post-<u>Austin</u> is a case of first impression for this Court. Appellant also asserts that its panhandling law can survive strict scrutiny if that standard is deemed to apply. Local governments seldom defend their laws on this basis and there is a corresponding dearth of appellate decisions applying this standard.

The briefing on these issues would be well complemented by an oral presentation of this case.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS.......................................................................ii-iii

TABLE OF CITATIONS ...................................................................iv-xii

STATEMENT OF JURISDICTION..................................................... xiii

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE AND FACTS ..................................... 2-9

    A.    Course of Proceedings........................................................ 2-7

    B.    Statement of the Facts ....................................................... 7-9

    C.    Statement of the Standard of Review....................................9

SUMMARY OF ARGUMENT .........................................................10

ARGUMENT ............................................................................. 11-54

I.    THE TRIAL COURT FAILED TO PROPERLY ANALYZE DAYTONA BEACH'S SOLICITATION ORDINANCE UNDER THE STANDARD SET IN CITY OF AUSTIN, TEXAS V. REAGAN NAT'L ADVERT. OF AUSTIN, LLC, 596 U.S. 61 (2022), WHICH ALLOWS FOR REGULATION OF SOLICITATIONS, PROVIDED ONLY THAT THEY DO NOT DISCRIMINATE ON THE BASIS OF TOPIC, SUBJECT MATTER OR VIEWPOINT.................................. 11-42

    A.    Daytona Beach's Solicitation Ordinance does not Discriminate on the Basis of Topic, Subject Matter or Viewpoint.................................................................. 24-27

    B.    Daytona Beach's Solicitation Ordinance Survives Review under Intermediate Scrutiny ......................................... 27-37

C.    Even if Daytona Beach's Solicitation Ordinance is Content-Based, it Survives Strict Scrutiny Given the Compelling Government   Interests   Asserted and the Narrowness of the Regulation ..................................................................................... 37-42

II.    THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN THIS CASE OF FIRST IMPRESSION, WHERE DISPUTED ISSUES OF MATERIAL FACT REMAINED AS TO THE CORE ISSUES OF NARROW TAILORING AND THE SUFFICIENCY OF THE GOVERNMENTAL INTEREST ..................................... 42-54

CONCLUSION ...................................................................................55

CERTIFICATE OF COMPLIANCE ....................................................56

CERTIFICATE OF SERVICE ..............................................................57

# <u>TABLE OF CITATIONS</u>

<u>CASES</u>                                                                                          <u>Page</u>

<u>Am. Civil Liberties Union of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.</u>,

    557 F.3d 1177 (11th Cir. 2009) .................................................................51, 52

<u>Americans for Prosperity Found. v. Bonta</u>,

    594 U.S. 595 (2021).........................................................................................41

<u>Baas v. Fewless</u>,

    886 F.3d 1088 (11th Cir. 2018) ....................................................................46

<u>Billups v. City of Charleston, S.C.</u>,

    961 F.3d 673 (4th Cir. 2020) .......................................................................34

<u>Board of Trustees of State Univ. of New York v. Fox</u>,

    492 U.S. 469 (1989) ................................................................................32, 33

<u>Bose Corp. v. Consumers Union of United States, Inc.</u>,

    466 U.S. 485 (1984) .......................................................................................51

<u>Bruni v. City of Pittsburgh</u>,

    941 F.3d 73 (3d Cir. 2019) ...........................................................................45

<u>Buchwald v. Univ. of New Mexico Sch. of Med.</u>,

    159 F.3d 487 (10th Cir. 1998) .....................................................................38

Burson v. Freeman,

    504 U.S. 191 (1992) ......................................................................37

Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc.,

    942 F.3d 1215 (11th Cir. 2019) ....................................................52

City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC,

    596 U.S. 61 (2022) .................................................................*passim*

City of Daytona Beach v. Scott, et al,

    Case No.: 23-13119 (11th Cir.) .......................................................4

City of Daytona Beach v. Scott, et al,

    Case No.: 24-12662-AA (11th Cir.) ............................................6, 7

City of Daytona Beach v. Scott, et al,

    Case No.: 24-12964-AA (11th Cir.) .................................................7

City of Renton v. Playtime Theatres, Inc.,

    475 U.S. 41 (1986)...............................................29 n. 10, 36, 48

Don's Porta Signs, Inc. v. City of Clearwater,

    829 F.2d 1051 (11th Cir. 1987) ....................................................52

FF Cosmetics FL, Inc. v. City of Miami Beach,

    866 F.3d 1290 (11th Cir. 2017) .......................................33, 34, 45

Fla. Bar v. Went For It, Inc.,

    515 U.S. 618 (1995) ......................................................................32

Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,

    11 F.4th 1266 (11th Cir. 2021) .........................................29 n. 10, 45

Gbalazeh v. City of Dallas, Texas,

    2019 WL 1569345 (N.D. Tex. Apr. 11, 2019) ...............................40

Gresham v. Peterson,

    225 F.3d 899 (7th Cir. 2000) ...................................................12, 13

Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,

    452 U.S. 640 (1981) ...........................................................16, 32, 40

Henagan v. City of Lafayette,

    2022 WL 4546721 (W.D. La. 2022) ............................................37

Hodosh v. Block Drug Co., Inc.,

    786 F.2d 1136 (Fed. Cir. 1986) ...................................................48

Homeless Helping Homeless, Inc. v. City of Tampa,

    2016 WL 4162882 (M.D. Fla. 2016) ...........................................38

Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston,

    515 U.S. 557 (1995) ....................................................................51

Int'l Caucus of Lab. Committees v. City of Montgomery,

    111 F.3d 1548 (11th Cir. 1997) ................................................................32

Jim Gall Auctioneers, Inc. v. City of Coral Gables,

    210 F.3d 1331 (11th Cir. 2000) ................................................................36

LaCroix v. Town of Fort Myers Beach, Fla.,

    38 F.4th 941 (11th Cir. 2022) ..........................................................17 n. 3

Lady J. Lingerie, Inc. v. City of Jacksonville,

    176 F.3d 1358 (11th Cir. 1999) ................................................................42

Lawrence v. Polis,

    505 F.Supp. 3d 1136 (D. Colo. 2020) ......................................................38

Matter of Subpoena 2018R00776,

    947 F.3d 148 (3d Cir. 2020) ....................................................................44

Mazo v. New Jersey Sec'y of State,

    54 F.4th 124 (3d Cir. 2022) ......................................................................20

McCullen v. Coakley,

    573 U.S. 464 (2014) ...............................................................29, 41 n. 13

McLaughlin v. Lowell,

    140 F.Supp. 3d 177 (D. Mass. 2015) ........................................................40

Messer v. City of Douglasville, Ga.,

    975 F.2d 1505 (11th Cir. 1992) ....................................................32

Messina v. City of Fort Lauderdale, Fla.,

    546 F.Supp. 3d 1227 (S.D. Fla. 2021) ..........................................15

Mize v. Jefferson City Bd. of Educ.,

    93 F.3d 739 (11th Cir. 1996) ........................................................43

Nat'l Fed'n of the Blind of Texas, Inc. v. City of Arlington, Texas,

    109 F.4th 728 (5th Cir. 2024) ...............................................19, 24

Norton v. City of Springfield, Ill.,

    768 F.3d 713 (7th Cir. 2014) ........................................................14

Norton v. City of Springfield, Ill.,

    806 F.3d 411 (7th Cir. 2015) ..................................................14, 15

Otto v. City of Boca Raton, Florida,

    41 F.4th 1271 (11th Cir. 2022) ..............................................51 n. 15

Perez v. Owl, Inc.,

    110 F.4th 1296 (11th Cir. 2024) ..........................................9, 11, 43

Ranch House, Inc. v. Amerson,

    238 F.3d 1273 (11th Cir. 2001) ..............................................23 n. 4

Reagan Nat'l Advert. of Austin, Inc. v. City of Austin,

    972 F.3d 696 (5th Cir. 2020) ........................................................................15

Reed v. Town of Gilbert, Ariz.,

    576 U.S. 155 (2015) ..............................................................................*passim*

Regents of Univ. of California v. Bakke,

    438 U.S. 265 (1978) ....................................................................................38

Schneider v. State of New Jersey,

    308 U.S. 147 (1939) ....................................................................................32

Smith v. City of Fort Lauderdale, Fla.,

    177 F.3d 954 (11th Cir. 1999) ........................................................12, 13, 27

Solantic, LLC v. City of Neptune Beach,

    410 F.3d 1250 (11th Cir. 2005) ..................................................................40

State Nat. Ins. Co. v. Cnty. of Camden,

    10 F. Supp. 3d 568 (D. N.J. 2014) ..............................................................48

StreetMediaGroup, LLC v. Stockinger,

    79 F.4th 1243 (10th Cir. 2023) .......................................................25 n. 7, 27

Thayer v. City of Worcester,

    2017 WL 1190366 (D. Mass. 2017) ............................................................15

Turner Broad. Sys., Inc. v. F.C.C.,

512 U.S. 622 (1994) ............................................................... 33

United States v. Jimenez-Shilon,

34 F.4th 1042 (11th Cir. 2022) ....................................... 45

United States v. Lee,

2024 WL 4836401 (D. D.C. Nov. 20, 2024) ................................. 18

U'SAgain, LLC v. City of Los Angeles,

2024 WL 4127273
(C.D. Cal. Sept. 9, 2024) ..............................................20, 24 n. 5

Valadez v. Paxton,

2023 WL 6536246 (W.D. Tex. July 26, 2023)............................... 52

Vill. of Schaumburg v. Citizens for a Better Env't,

444 U.S. 620 (1980)........................................................... 46

Waggoner v. City of Dallas,

WL 5516474 (N.D. Tex. July 20, 2023),................................... 18

Ward v. Rock Against Racism,

491 U.S. 781 (1989) ............................. 14, 29, 29 n. 10, 31, 33, 45

Warren v. DeSantis,

90 F.4th 1115 (11th Cir. 2024) ...........................................9, 43, 51

x

<u>Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton</u>,

    536 U.S. 150 (2002) .......................................................................45

<u>Williams-Yulee v. Fla. Bar</u>,

    575 U.S. 433 (2015) ...........................................37, 41 n. 14, 44

<u>CONSTITUTION</u>                                <u>Page</u>

    U.S. CONST. AMEND. I ...........................................................*passim*

<u>STATUTES</u>                                      <u>Page</u>

    28 U.S.C. §1291 ............................................................... xiii

<u>RULES</u>                                          <u>Page</u>

    Rule 28.1(e)(2), <u>Fed.R.App.P.</u> .......................................................56

    Rule 32(a)(5), <u>Fed.R.App.P.</u> ......................................................... 56

    Rule 32(a)(6), <u>Fed.R.App.P.</u> .........................................................56

    Rule 32(a)(7)(B), <u>Fed.R.App.P.</u> ....................................................56

    Rule 32(a)(7)(B)(iii), <u>Fed.R.App.P.</u> ...........................................56

    Rule 56(c), <u>Fed.R.Civ.P.</u> ..............................................................43

    11th Cir. Rule 26.1 ............................................................. C-1 of 3

<u>ORDINANCES</u>                                  Page

§66-1, Daytona Beach Code ................................................................ *passim*

§66-1(b), Daytona Beach Code ........................................................ 2, 11, 26

§66-1(b)(3), Daytona Beach Code................................................... 25

§66-1(c)(1), Daytona Beach Code ................................................... 5

§66-1(c)(3), Daytona Beach Code ................................................... 5

§66-1(c)(4), Daytona Beach Code ...................................................5, 11

§66-32, Daytona Beach Code ...........................................................26 n. 8

§82-4, Daytona Beach Code ..............................................................26 n. 8

Ordinance No. 19-27 .........................................................................6

OTHER SOURCES                                             <u>Page</u>

Black's Law Dictionary 1677 (11th ed. 2019) .........................................3, 16

*Panhandling Laws*, The First Amendment Encyclopedia (2017)
https://www.mtsu.edu/first-amendment/article/1215/panhandling
-laws (last accessed 11/25/24) .............................................................12 n. 2

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from an Order granting partial summary judgment of the United States District Court for the Middle District of Florida, holding that the Daytona Beach Solicitation Ordinance, §66-1, violates the First Amendment. The Order was followed by entry of a Final Judgment.

This Court has jurisdiction pursuant to 28 U.S.C. §1291:

The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . .

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

I.      WHETHER THE TRIAL COURT ERRED WHEN IT CONCLUDED THAT DAYTONA BEACH'S SOLICITATION ORDINANCE WAS CONTENT-BASED UNDER <u>REED V. TOWN OF GILBERT, ARIZ.</u>, 576 U.S. 155 (2015) INSTEAD OF APPLYING THE STANDARD SET FORTH IN THE MORE RECENT DECISION OF <u>CITY OF AUSTIN, TEXAS V. REAGAN NAT'L ADVERT. OF AUSTIN, LLC</u>, 596 U.S. 61 (2022).

II.     WHETHER DAYTONA BEACH'S SOLICITATION ORDINANCE SURVIVES INTERMEDIATE SCRUTINY.

III.    WHETHER DAYTONA BEACH'S SOLICITATION ORDINANCE CAN SURVIVE STRICT SCRUTINY SHOULD THAT STANDARD APPLY.

IV.     WHETHER DISPUTED ISSUES OF MATERIAL FACT CONCERNING NARROW TAILORING AND THE GOVERNMENTAL INTEREST PRECLUDED ENTRY OF SUMMARY JUDGMENT IN THIS CASE OF FIRST IMPRESSION.

## STATEMENT OF THE CASE

### A.    Course of proceedings and disposition in the Court below

In 2019, the City of Daytona Beach enacted §66-1, which regulates the times and locations where individuals can engage in "panhandling". (Doc. 20-2). The Ordinance defines "panhandling" to include any solicitation seeking an immediate payment of money or something of value. *See*, §66-1(b).

On November 28, 2022, Plaintiffs filed suit claiming that §66-1 is a content-based law which violated their First Amendment right of expression facially and as-applied to them. (Doc. 1). Shortly thereafter, the Plaintiffs moved for a preliminary injunction. (Doc. 8). The Court took no action on the injunction request. Instead, the Court dismissed the Complaint *sua sponte* as a shotgun pleading. (Doc. 34). Plaintiffs filed their Amended Complaint on February 10, 2023 (Doc. 35) and renewed their request for an injunction. (Doc. 39). Plaintiffs requested oral argument on their motion. (Doc. 40). The U.S. Department of Justice filed a Statement of Interest, but did not intervene in the case. (Doc. 26).

Daytona Beach filed its Response to Plaintiffs' Second Motion for Preliminary Injunction on February 28, 2023 (Doc. 44). The City asserted that §66-1 was content-neutral because its application did not turn on the speaker or his speech and all solicitations seeking immediate consideration were subject to its time, place,

2

and manner restrictions. (Doc. 44 at 15-16). Appellant argued that regulations of this

kind must be deemed content-neutral under the Supreme Court's recent decision in

City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61 (2022),

which modified the standard previously adopted in Reed v. Town of Gilbert, Ariz.,

576 U.S. 155 (2015). The key language from City of Austin, relied on by Appellant

below (and in this Brief), is as follows:

> Most relevant here, **the First Amendment allows for regulations of
> solicitation** - that is, speech "requesting or seeking to obtain
> something" or "[a]n attempt or effort to gain business." Black's Law
> Dictionary 1677 (11th ed. 2019). To identify whether speech entails
> solicitation, one must read or hear it first. Even so, the Court has
> reasoned that ***restrictions on solicitation are not content based*** and do
> not inherently present "the potential for becoming a means of
> suppressing a particular point of view," so long as they do not
> discriminate based on topic, subject matter, or viewpoint.

Austin, 596 U.S. at 72 (Emphasis added) (Doc. 122 at 1).

Daytona Beach argued that §66-1 was subject to intermediate scrutiny and

would survive that level of review because its restrictions did not substantially

burden speech, were supported by significant government interests, and were

narrowly tailored. (Doc. 122 at 12-18). The City argued in the alternative that §66-1

could survive strict scrutiny based on compelling government interests (prevention

of disease and pedestrian and traffic safety) and its concerted effort to utilize the

least restrictive means of regulation. (Doc. 122 at 18-21). Appellant submitted its

entire legislative record together with affidavits attesting to the key facts supporting its compelling governmental interests. (Doc. 121, Ex. 1-12, 29-36, 38).[1]

The District Court directed the parties to advise whether an evidentiary hearing was required on the Plaintiffs' Second Motion for Preliminary Injunction. (Doc. 41). In the parties' response, the Plaintiffs took the position that an evidentiary hearing was not required, but reiterated their request for a one-hour oral argument. (Doc. 45). Daytona Beach asserted that an evidentiary hearing was indispensable given the bitterly disputed facts pertaining to the substantiality of the government's interests and the issue of narrow tailoring. Appellant identified twelve factual categories which required development through live evidence. (Id). The parties subsequently engaged in extensive discovery, including depositions which centered on the aforementioned bitterly disputed facts. (Doc. 121-13, 121-16, 121-17, 121-18, 121-20, 121-22, 121-23, 121-26, 121-27).

On August 29, 2023, the District Judge granted Plaintiffs' Second Motion for Preliminary Injunction and enjoined portions of §66-1 without conducting a hearing of any kind. (Doc. 72).

On September 21, 2023, Daytona Beach appealed the preliminary injunction order. (Doc. 74). That appeal was assigned Case No.: 23-13119 by this Court. The

---

[1] Appellees agreed to the authenticity of the legislative record. (Doc. 45 at 2).

arguments and briefing in that case substantially mirror the issues presented in this appeal. However, Appellant also argued in the first appeal that the trial Court abused its discretion by not conducting an evidentiary hearing prior to entering its injunction order. Following entry of the permanent injunction by the trial Court, Appellant filed its Motion to Dismiss Appeal as Moot. This Court granted the motion and dismissed the first appeal as moot on October 4, 2024.

The Plaintiffs filed their Motion for Partial Summary Judgment on December 5, 2023. (Doc. 108). The City filed a Response (Doc. 122), but did not file a cross-motion for summary judgment. It was the City's contention that disputed issues of material fact remained which necessitated a trial. (Doc. 122 at 1-7). The Plaintiffs filed their Reply on January 25, 2024. (Doc. 124).

The trial Court did not conduct a hearing or entertain argument on the summary judgment motion. Instead, on July 18, 2024, the Court entered its Order granting the Motion for Partial Summary Judgment. (Doc. 151). That Order declared that §§66-1(c)(1) and (c)(3)-(4) violated the First Amendment and were unconstitutional. (Id). The Court entered a permanent injunction against enforcement of those provisions. (Doc. 151 at 17). The Court denied as moot the parties' various Daubert motions and motions in limine. (Id.). Finally, the Court scheduled a bench trial for September 16, 2024, on the issue of damages. (Id.).

5

Out of an abundance of caution and in order to preserve all of its defenses, the City of Daytona Beach appealed from the summary judgment order on August 15, 2024. (Doc. 160). The appeal was assigned Case No.: 24-12662-AA by this Court.

On August 23, 2024, the parties entered into a stipulation which fixed an amount of damages to be awarded to the Plaintiffs, should they prevail following appeal, and requested that the Court enter a final judgment in accordance with those terms. (Doc. 164; Doc. 164-1). The parties' stipulation and joint motion specifically acknowledged that the "Defendant has filed an interlocutory appeal of the Court's ruling on summary judgment and reserves the right to appeal the entry of final judgment on liability and injunctive relief in favor of Plaintiffs as well." (Doc. 164 at 2, ¶ 6). In addition, the stipulation acknowledged that the award of damages was contingent upon the outcome of those appeals:

> b.     if the summary judgment order (ECF 151) is reversed in its entirety on appeal and no provision of Ordinance No. 19-27 is subsequently declared to be unconstitutional on remand or further appeal, Plaintiffs will not be entitled to any award of damages.

(Doc. 164 at 2, ¶ 7; 164-1 at 5, ¶ 7).

On September 6, 2024, the Court entered its Order awarding damages and directing entry of final judgment. (Doc. 165) The trial Court reserved jurisdiction to award attorney's fees and costs at the conclusion of all appeals. (Id.).

Final Judgment was entered in this case on September 6, 2024. (Doc. 166).

6

The City filed a timely appeal from the Final Judgment on September 12, 2024. (Doc. 168). This plenary appeal was assigned Case No.: 24-12964-AA by this Court.

On September 17, 2024, Appellant moved to consolidate the appeals in Case Nos. 24-12662-AA and 24-12964-AA on a consent basis. This Court granted the motion to consolidate on September 18, 2024.

**B.    Statement of the Facts**

Plaintiffs are persons who allegedly regularly engage in panhandling in Daytona Beach and rely on that income for their living. (Doc. 35 at 1; Doc. 39-1; 39-2; 39-3; 39-4; 39-5; 39-6; 39-7). The Plaintiffs allege that they are or have been homeless. The subject panhandling ordinance does not mention homelessness or regulate the experience of being homeless in any way. (Doc. 35 at 1). Plaintiffs claim that §66-1 is a content-based law on its face because it only regulates solicitations for the immediate donation of money. (Doc. 39 at 4). Plaintiffs asserted that they engaged in fewer solicitations in Daytona Beach than they would have had the law not been in effect. (Doc. 35 at 3-5; 108-2 at 4). Plaintiff Driggers was arrested several times for having violated the law. (Doc. 35 at 4 ¶ 13).

From the inception of this case, Daytona Beach asserted that there were disputed facts at issue below which bore on these central constitutional questions.

Even at the time the preliminary injunction was being considered, the City identified a dozen categories of disputed facts including such crucial issues as:

    a.    The physical geography and demographics of where the Plaintiff's solicitations occur.

    b.    When the Plaintiff's solicitations occur.

    c.    The alternative avenues of communication available under the subject Ordinance.

    …

    g.    Whether the Ordinance substantially burdens Plaintiffs' speech given the abundant alternative avenues provided and, if so, what specific aspects of the Ordinance burden what specific aspects of Plaintiffs' speech.

    h.    Whether Plaintiffs intend to engage in "aggressive panhandling" and whether Daytona Beach's ban on such conduct has any effect on Plaintiffs' speech.

    i.    The details and substance of the sworn statement and testimony of Dr. Steven Miles in support of a compelling state interest.

    …

    k.    The substance and relevance of the sworn statement and testimony of John Clary, head of the intellectual property GIS division of Daytona Beach … regarding the percentage (in terms of acreage) of Daytona Beach available for panhandling after application of the distance parameters of the subject Ordinance.

(Doc. 45 at 4-6). Those same categories of fact were identified as disputed in the City's Response to the Plaintiffs' Motion for Partial Summary Judgment. (Doc. 122

at 3-6).

Both parties retained experts to quantify the geographic scope of §66-1 and to critically evaluate the public health issues addressed by the law. (Doc. 121-37; 121-38; 121-39; 121-40). The City showed that 97.5% of the City was available for solicitations (Doc. 121-30 at 28-29); Plaintiffs claimed the figure was 31.9% (Doc. 107-1).

The trial Court did not hold an evidentiary hearing or entertain oral argument by counsel at the preliminary injunction stage or prior to entry of the summary judgment.

After summary judgment, the parties stipulated to damages awardable to the Plaintiffs, but contingent upon the outcome of this appeal. (Doc. 164).

### C.    Statement of the Standard of Review

The District Court's grant of summary judgment is subject to *de novo* review by this Court. *See*, Perez v. Owl, Inc., 110 F.4th 1296, 1301 (11th Cir. 2024). Because this case involves First Amendment issues, all "constitutional facts" are reviewed *de novo* and any "historical facts" are reviewed for clear error. *See,* Warren v. DeSantis, 90 F.4th 1115, 1126 (11th Cir. 2024)

## SUMMARY OF THE ARGUMENT

This appeal presents a case of first impression for this Circuit. In City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61 (2022) the Supreme Court significantly modified the standards for evaluating content-neutrality established in Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015). The Austin Court held that "the First Amendment allows for regulations of solicitation… restrictions on solicitation are not content based…". Id. at 72 Appellant maintains that laws regulating solicitations as a category do not offend the First Amendment and do not discriminate based on content unless particular speech or particular speakers are treated differently based on what they say.

Daytona Beach's solicitation ordinance, §66-1, is subject to intermediate scrutiny which it easily survives given the careful effort to narrowly tailor the law to advance a well-documented governmental interest. If this Court holds that Daytona's ordinance is subject to strict scrutiny, the law is nevertheless constitutional as it employs the least restrictive means of advancing a compelling governmental interest.

The trial Court ruling must be reversed because disputed issues of fact remain for determination in this fact-intensive case. The ruling is erroneous in any event as Daytona's solicitation law is constitutional under any form of scrutiny.

## ARGUMENT

**I.    THE TRIAL COURT FAILED TO PROPERLY ANALYZE DAYTONA BEACH'S SOLICITATION ORDINANCE UNDER THE STANDARD SET IN <u>CITY OF AUSTIN, TEXAS V. REAGAN NAT'L ADVERT. OF AUSTIN, LLC</u>, 596 U.S. 61 (2022), WHICH ALLOWS FOR REGULATION OF SOLICITATIONS, PROVIDED ONLY THAT THEY DO NOT DISCRIMINATE ON THE BASIS OF TOPIC, SUBJECT MATTER, OR VIEWPOINT.**

<u>STANDARD OF REVIEW</u>:  The District Court's grant of summary judgment is subject to *de novo* review by this Court. *See*, <u>Perez v. Owl, Inc.</u>, 110 F.4th 1296, 1301 (11th Cir. 2024).

Daytona Beach's solicitation ordinance is constitutional and the trial Court erred in finding that it regulated on the basis of the content of the Plaintiffs' speech. The Ordinance principally regulates on the basis of geographic location. Persons wishing to engage in solicitation can do so anywhere in the City except around especially busy traffic corridors and at sensitive locations such as schools, facilities with ATMs and other areas where people are a captive audience. *See*, §66-1(b) "prohibited areas" Doc. 121-34. The Ordinance also prohibits solicitations at night and where the conduct is so aggressive as to be the equivalent of an assault. *See*, §66-1(c)(4). Solicitations are defined narrowly to include immediate requests for money or some other item of value (thereby excluding advocacy speech as well as campaigns for donations at a later time or place). *See*, §66-1(b), "panhandle".

In short, Daytona Beach's regulations of panhandling and solicitations impose

11

time, place, and manner restrictions not much different from laws which have been on the books for many years in communities across the country.[2] The City has enacted time, place, and manner restrictions which govern where solicitation may take place. Crucially, this law is *not* dependent on the content or viewpoint of any solicitations. Solicitors remain free to say whatever they wish; solicitors can seek money or items of value for their own benefit or for any charity or cause they choose. *What* they say is not the issue under Daytona's Code. Rather it is *where* they say it, *when* they say it and - in the case of aggressive solicitations – *how* they say it. (§66-1)

In past years, ordinances regulating panhandling and other solicitations were typically treated as time, place, and manner restrictions subject to intermediate scrutiny. For example, in Smith v. City of Fort Lauderdale, Fla., 177 F.3d 954, 956 (11th Cir. 1999) this Court upheld a ban on solicitations along Fort Lauderdale's beaches. This Court determined that the ban was limited in terms of geography and subject to intermediate scrutiny. Id. at 956.

In Gresham v. Peterson, 225 F.3d 899 (7th Cir. 2000), the Seventh Circuit

---

[2] *See, generally*, *Panhandling Laws*, The First Amendment Encyclopedia (2017) https://www.mtsu.edu/first-amendment/article/1215/panhandling-laws (last accessed 11/25/24). ("In recent years, an increasing number of U.S. cities have enacted ordinances restricting panhandling because of the influx of people living in public spaces. For the most part, cities are particularly concerned about the effects of panhandling on public safety, tourism and small businesses.").

turned away a First Amendment and vagueness challenge to an ordinance which closely resembles Daytona Beach's law. The Indianapolis ordinance prohibited aggressive panhandling in terms almost identical to those employed by Daytona Beach. Id. at 901. Panhandling was banned "on any day after sunset, or before sunrise." Id. Solicitations were also prohibited near bus stops, cafes, ATM machines, and in parked vehicles. Id., which are all very similar to Daytona's law.

Historically, laws such as those addressed in Smith and Gresham were not thought to be content-based because the subject matter of the conversation between the panhandler and the public was not at issue.  The laws were constitutional because they were justified for reasons having nothing to do with the content or viewpoint of the speech or the identity of the speaker.

That view changed dramatically with the Supreme Court's decision in Reed v. Town of Gilbert, 576 U.S. 155 (2015) which radically redefined what it means for a law to be content-based. In Reed, a case which had nothing to do with panhandling or solicitation, the Supreme Court evaluated a ban on temporary signs which allowed for a host of categorical exceptions based on the message displayed. Justice Thomas, speaking for a particularly fractured plurality, found that the need to evaluate the content of individual signs meant that the ordinance was content-based even if the goal was not to censor any particular message:

> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

Reed, 576 U.S. at 163–64.

While not directly addressing the subject of panhandling, the foregoing paragraph in Reed nonetheless had an immediate, dramatic, and pervasive effect on the lower courts' treatment of solicitation ordinances. One conspicuous example was Norton v. City of Springfield, Ill., 768 F.3d 713 (7th Cir. 2014), decided before Reed, and the same case on remand: Norton v. City of Springfield, Ill., 806 F.3d 411 (7th Cir. 2015). In the first Norton decision, the Seventh Circuit easily upheld a conventional solicitation law against a First Amendment challenge. Following Reed, the Seventh Circuit completely reevaluated its position and reached exactly the opposite decision. The Court noted the impact that Reed had on what was previously well-established law:

> I join the opinion of the court in full, but write separately to underscore the significance of the Supreme Court's recent decision in Reed v. Town of Gilbert, which held that a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter. _ U.S. _, 135 S.Ct. 2218, 2230, 192 L.Ed.2d 236 (2015). ... Few regulations will survive this

14

rigorous standard.

Norton, 806 F.3d at 413 (J. Manion, concurring). A tsunami of similar opinions followed in the wake of Reed. *See, e.g.*, Thayer v. City of Worcester, 2017 WL 1190366 (D. Mass. 2017) (Solicitation ordinance was found to be content-based after a GVR of the Circuit Court opinion upholding the same law); Messina v. City of Fort Lauderdale, Fla., 546 F.Supp. 3d 1227, 1240 (S.D. Fla. 2021) ("[P]anhandling laws, in the wake of Reed, have been enjoined by federal courts across the country…").

Following Reed, the Supreme Court took up the case of City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61 (2022), which considered the constitutionality of a sign ordinance which distinguished between on-premises and off-premises advertising. The lower Court struck down the law as an easy and self-evident application of Reed:

> [I]f "[a] reader must ask: who is the speaker and what is the speaker saying" to apply a regulation, then the regulation is automatically content based.

City of Austin, 596 U.S. at 69 *citing* Reagan Nat'l Advert. of Austin, Inc. v. City of Austin, 972 F.3d 696, 706 (5th Cir. 2020).

The Supreme Court reversed, finding that a law was *not* necessarily content-based simply because one had to read the message to determine whether the law

applies:

> Underlying these cases and others is a rejection of the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern. Rather, it is regulations that discriminate based on "the topic discussed or the idea or message expressed" that are content based. <u>Reed</u>, 576 U.S. at 171, 135 S.Ct. 2218.

<u>Id</u>. at 73–74.

While not overturning the entirety of <u>Reed</u>, there can be no question that <u>Reed's</u> content-neutrality inquiry has been modified. The Court describes this as a rejection of a simple "read-the-sign rule" in favor of a review which determines whether categorical distinctions treat different speakers differently. <u>Id</u>. at 75.

In <u>Austin</u>, the Supreme Court felt it necessary to directly address the constitutionality of laws regulating solicitation:

> Most relevant here, the First Amendment allows for regulations of solicitation - that is, speech "requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." Black's Law Dictionary 1677 (11th ed. 2019). To identify whether speech entails solicitation, one must read or hear it first. Even so, the Court has reasoned that ***restrictions on solicitation are not content based*** and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint. <u>Heffron v. International Soc. for Krishna Consciousness, Inc.</u>, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

<u>Id</u>. at 72 (emphasis added).

<u>Austin</u>'s consequential statement that "restrictions on solicitation are not

content based" was surely motivated by the concurring opinions in <u>Reed</u> which warned of unintended consequences of that decision:

> [O]n the majority's view, courts would have to determine that a town has a compelling interest in informing passersby where George Washington slept.…
>
> …
>
> … [C]ourts will strike down those democratically enacted local laws even though no one - certainly not the majority - has ever explained why the vindication of First Amendment values requires that result.

<u>Reed</u>, 576 U.S. at 181, 185 (J. Kagan, concurring); *Compare*, <u>Austin</u>, 596 U.S. at 79–80 (J. Breyer, concurring) ("One possibility is that courts will strike down 'entirely reasonable' regulations that reflect the will of the people.").

Justice Breyer's prescient concurrence in <u>Reed</u> included a list of laws which should not be considered to be content-based as a category, such as securities regulations and warnings on prescription labels. <u>Id.</u> at 177 (J. Breyer, concurring). In <u>Austin</u>, Justice Breyer expanded on that initial list to specifically include "panhandling" and "solicitation on behalf of charities". <u>Austin</u>, 596 U.S. at 79 (J. Breyer, concurring). <u>Austin</u> is so recently decided that the Eleventh Circuit has not yet spoken definitively on the subject[3] and no Florida court has yet issued a ruling

---

[3] To date, only one Eleventh Circuit case has cited to <u>Austin</u>: <u>LaCroix v. Town of Fort Myers Beach, Fla.</u>, 38 F.4th 941, 947 (11th Cir. 2022). That case determined that a ban on all portable signs was content-neutral under <u>Austin</u> because the ban applied to all portable signs regardless of what message was displayed. The analysis in <u>LaCroix</u> has some value for this case. Section 66-1 must be deemed content-

directly on point, other than the instance case.

Trial court decisions from other jurisdictions are only now beginning to address the impact of <u>Austin</u> on panhandling, soliciting, and charitable undertakings. In <u>Waggoner v. City of Dallas</u>, 2023 WL 5516474 at *11 (N.D. Tex. 2023), *report and recommendation adopted*, 2023 WL 5517220 (N.D. Tex. 2023), the Court denied an injunction where a general ban on standing or walking on traffic medians was challenged by a homeless man who solicited donations along the roadways. The ban on utilizing medians was subject to what the Court described as "narrowly drawn, non-discriminatory exceptions". <u>Id</u> at *6. The Court concluded that the law as a whole was content-neutral, relying on <u>Austin</u>'s characterization of the inquiry and noting <u>Austin</u>'s specific language concerning the content-neutrality of laws governing solicitations. <u>Id</u>. at *5. *Compare*, <u>United States v. Lee</u>, 2024 WL 4836401 at *4-5 (D. D.C. Nov. 20, 2024) (Ban on public access to the Capitol during the January 6th electoral count was a content neutral restriction).

Unfortunately, there are no Circuit-level decisions specifically addressing the impact of <u>Austin</u> on panhandling ordinances. However, there are a number of Circuit

---

neutral because it applies to all instances of solicitation for the immediate donation of money or consideration. It must be upheld under intermediate scrutiny because it does *not* impose a complete ban (as was the case in <u>LaCroix</u>) but allows unrestrained solicitations almost everywhere in the City during any daylight hours.

Court opinions involving analogous fact patterns which are instructive.

Of these decisions, Nat'l Fed'n of the Blind of Texas, Inc. v. City of Arlington, Texas, 109 F.4th 728 (5th Cir. July 17, 2024) bears the closest resemblance to the facts below. Instead of regulating panhandlers, the ordinance in Nat'l Fed'n of the Blind regulated the use of unattended donations bins through a permitting system and restrictions on their size and placement. A charitable organization challenged the ordinance claiming that the law targeted charitable donations and was therefore content-based. The Fifth Circuit rejected that argument, concluding that, although the ordinance primarily affected charitable donations, the time, place, and manner restrictions were not dependent upon the content of speech:

> On its face, the Ordinance regulates all donation boxes without reference to content. The signage on the donation boxes is of no consequence. *See* Reagan, 596 U.S. at 71–72, 142 S.Ct. 1464. Neither does the Ordinance discriminate based on the taxable status, mission, or purpose of the person or entity placing the donation box. It specifically regulates only the manner and place of donation solicitation - e.g., solicitation in the *manner* of a donation box, located in prohibited *places*.
>
> Therefore, the Ordinance "discriminates on the basis of non-expressive, non-communicative conduct" - solicitation manner and place - but does "not discriminate based on topic, subject matter, or viewpoint". Recycle for Change, 856 F.3d at 672; Reagan, 596 U.S. at 72, 142 S.Ct. 1464. Moreover, although the Ordinance curtails solicitation by the manner of donation boxes, entities may continue to solicit donations by all other means in all locations within the city. The Supreme Court has concluded similar restrictions on only the manner or place of expressive conduct are facially content-neutral. *See, e.g.*,

Reagan, 596 U.S. at 71–74, 142 S.Ct. 1464 (concluding regulation of off-premises signs was location-based and content-neutral) (additional citation omitted).

Id. at 734–35.

As will be seen below, the trial Court was convinced that Daytona's ordinance must be content-based because the Court believed that §66-1 only regulated solicitations that requested a charitable donation and excluded other kinds of solicitations. Exactly the same argument was raised in Nat'l Fed'n of the Blind:

In opposition, the Charities assert: by regulating receptacles that solicit donations but no others (e.g., receptacles collecting trash or ballots), the Ordinance targets charitable solicitations and is therefore content-based.

Id. at 735. The Fifth Circuit utterly rejected that false equivalency - as should this Court:

As noted, the Ordinance regulates all donation boxes, encompassing both charitable and non-charitable solicitations. It "is agnostic as to content", and, therefore, facially content-neutral to the extent it regulates expressive activity. Reagan, 596 U.S. at 69, 142 S.Ct. 1464.

Id.; See, also, U'SAgain, LLC v. City of Los Angeles, 2024 WL 4127273 at *4 (C.D. Cal. Sept. 9, 2024) (Holding that a similar law restricting the location of unattended solicitation boxes was content-neutral because it regulated "without regard to the charitable or business purpose.").

In Mazo v. New Jersey Sec'y of State, 54 F.4th 124 (3d Cir. 2022), cert. denied sub nom. Mazo v. Way, 2023 WL 6377826 (2023), the Third Circuit upheld

20

the decision of the New Jersey Secretary of State to deny a request by political candidates to include their campaign slogans on primary ballots. In addressing the question of content-neutrality, the Court began by explaining the specific changes in the law wrought by Austin:

> Under City of Austin, then, a law is "agnostic as to content," if it "requires an examination of speech only in service of drawing neutral" lines. Id. at 1471. One category of such neutral line-drawing tracks ordinary time, place, or manner regulations, such as the on-/off-premises distinction at issue in City of Austin, which related only to the location of speech. See id. at 1472-73. A second category of neutral line-drawing distinguishes between speech based on its function or purpose without indirectly regulating subject matter, such as whether speech constitutes "solicitation." Id. at 1473.

Id. at 149.

While the New Jersey restriction applied only to slogans and not to other content (such as the candidate's name or party affiliation), the Court noted that *all* slogans were subject to the law so that it was proper to treat the regulation as content-neutral:

> Unlike the sign code in Reed, the consent requirement applies to all slogans, regardless of message, and does not "single out any topic or subject matter for differential treatment." Id. at 1472. Appellants argue that the consent requirement regulates slogans based "entirely on the communicative content of [slogans,]" but this is not so. … Rather, the communicative content of the slogan - i.e., whether the slogan names an individual or a New Jersey incorporated association - only matters to determine whether the consent requirement applies at all. Once a regulator has read a slogan to determine whether the consent requirement applies, the communicative content of the slogan ceases to

21

be relevant. Accordingly, the consent requirement is content neutral. Id. at 149.

These cases show a widespread recognition that solicitation ordinances will not be deemed content-based under Austin unless they target particular speakers or messages. In other words, distinctions based on categories defined by speech are not automatically content-based unless they also discriminate against certain speakers because of what is said. The significance of a finding of content-neutrality for the instant case is that the law will be subject to intermediate scrutiny rather than strict scrutiny. *See*, Austin, 596 U.S. at 76.

The trial Court made two grievous errors in applying Austin to these facts. First, the Court did not recognize that Austin carved out a category - regulation of solicitations - which would not be treated as content-based even though a regulator would need to know what was said in order to apply the law. The trial Court below apparently concluded that a law regulating solicitations is content-based unless it regulates *all* forms of solicitations:

> "[The plain language of the Ordinance at issue in this case circumscribes only solicitations for donations, but not solicitations to patronize a business, attend an event, or support a religious or social cause."  (Doc 151 at 12).

The trial Court did not entertain <u>Austin</u>'s view that a law regulating every form of immediate donation can be content-neutral so long as it does not discriminate among speakers or ask why the donation is being solicited.

The second error below involved a fundamental misunderstanding of what Daytona Beach's law regulates. On its face, the law clearly applies to every solicitation requesting the immediate donation of money or something else of value. The City repeatedly and insistently pointed out below that political donations are included, that religious donations are included, and that donations for social causes are likewise subject to the law without exception. (Doc. 44 at 15, 18-19; Doc. 122 at 2, 12-13).

Unfortunately, the trial Court interpreted the word "donation" to mean "charity" and construed the ordinance as one applying only to charitable donations: "the Challenged Provisions are content based because they apply only to solicitations for charitable donations." (Doc. 151 at 10). That mistake colored the remainder of the Court's opinion and led inexorably to error.[4]

---

[4] The District Court's misapprehension of the record evidence shows why the Court would have benefited from an evidentiary presentation - or even an oral argument on the legal issues. *Cf.*, <u>Ranch House, Inc. v. Amerson</u>, 238 F.3d 1273, 1284 (11th Cir. 2001) ("We therefore remand this case to afford the Defendants… an opportunity to develop a foundation for their claim that the statute's purpose was to combat secondary effects.").

A.   **DAYTONA BEACH'S SOLICITATION ORDINANCE DOES NOT DISCRIMINATE ON THE BASIS OF TOPIC, SUBJECT MATTER, OR VIEWPOINT.**

In addition to missing the import of <u>Austin</u>, the District Court fundamentally

misconstrued the purpose and effect of Daytona Beach's solicitation ordinance:

> City of Austin cannot support the Challenged Provisions because they target charitable solicitations but do not restrict any other sort of solicitation, whether political, religious, or commercial.

(Doc. 151 at 11). The trial Court made a point of noting that it had already reached

this same conclusion twice before.

> Here, the Challenged Provisions are content based because they apply only to solicitations for charitable donations. The Court has already twice arrived at this conclusion in orders granting a preliminary injunction and denying Defendant's Motion to Stay that injunction.

(Doc. 151 at 10). But being wrong three times in a row is no virtue.[5]

It is not clear how the Court could have possibly reached such a conclusion

given the plain language of the Ordinance. Section 66-1 clearly defines solicitations

so that it reaches *every* conceivable instance where an immediate donation is made

---

[5] As previously noted, the Court in <u>Nat'l Fed'n of the Blind</u> was faced with the same issue: whether a law regulating "donation" boxes should be treated as content-based because it largely impacted charitable donations. In contrast to the decision below, the Court in <u>Nat'l Fed'n of the Blind</u> determined that the law was content-neutral because it "encompass[ed] both charitable and non-charitable solicitations.". 109 F.4th at 735; *See, also*, <u>U'SAgain</u>, 2024 WL 4127273 at *4 (Donation box ordinance was content-neutral because it regulated "without regard to the charitable or business purpose.").

in response to a request:

> *Panhandle* means to beg or make any demand or request made in person for an immediate donation of money or some other article of value from another person for the use of one's self or others, including but not limited to for a charitable or sponsor purpose or that will benefit a charitable organization or sponsor. As used in this article, the word "solicit" and its forms are included in this definition.… Begging is included in this definition of panhandling. Soliciting is including in this definition of panhandling.

§66-1(b)(3) - Definitions *Panhandle* (Doc. 121-2 at 9).[6] That all-inclusive definition was specifically written so that there would be no exceptions; all requests for the immediate donation of money are included, regardless of content, viewpoint or the identity of the speaker.[7] In the words of <u>Austin</u>, the Ordinance is completely "agnostic as to content". <u>Austin</u>, 596 U.S. at 69.

Under §66-1, a regulated solicitation certainly *could* be for charitable purposes. However, the solicitation could also be for political or religious purposes

---

[6]   The Court found that "[t]he Ordinance does not provide definitions for begging and  soliciting". (Doc. 151 at 2, n. 1). That is simply wrong. Section 66-1 defines "panhandling" with concise language and specifically states that "begging" and "soliciting" are included within that defined term.

[7]   The fact that §66-1 applies only when there is an exchange of money or other thing of value does not transform the Ordinance into a content-based law. *See*, <u>StreetMediaGroup, LLC v. Stockinger</u>, 79 F.4th 1243, 1250–51 (10th Cir. 2023) (Sign law which required billboard owners to obtain a permit for displaying paid messages but not for messages for which payment was not received was not content-based).

or to support some social cause. Daytona Beach briefed this point repeatedly, comprehensively and as clearly as possible:

> [T]he ordinance applies to *every* solicitation seeking something of value include political donations, religious alms and contributions to social causes. *See*, §66-1(b) (Doc. 121-2 at 9). No content or speaker is singled out for regulation based on what they say or who they are.

(Doc. 122 at 2).

> A politician or clergyman who solicits a direct donation or contribution will be prosecuted under the Ordinance to the same extent as a panhandler – not because of their political or religious speech, but because they solicited incident to that speech.

(Doc. 44 at 15).

The trial Court attempted to bolster its conclusion that §66-1 applies only to charitable speech by noting that the law does not regulate commercial solicitations. (Doc. 151 at 11-12). While there is a distinction between those two categories of speech, there is a reason why §66-1 does not regulate commercial solicitation: those economic transactions are already regulated by other parts of the City Code.[8] Section 66-1 addresses an entirely different problem which falls outside the scope of the City's commercial restrictions. Within the defined category of "panhandling", §66-1

---

[8] The City has a comprehensive system for regulating street vendors and others engaged in commercial solicitations within Daytona Beach. *See*, §66-32 (Selling or offering to sell from vehicles on public streets or rights-of-way); §82-4 (Display, promotion, or sales of merchandise, food, and beverages).

does in fact apply to every solicitation for the immediate donation of money. However, according to <u>Austin</u>, that fact does not mean that the Ordinance is content-based.

Section 66-1 regulates *all* attempts to solicit an immediate donation of money (or other item of value) without regard to content or viewpoint. Under <u>City of Austin</u>, a solicitation law which does not discriminate based on content or the identity of the speaker is content-neutral on its face and is subject to intermediate scrutiny, not strict scrutiny. *See*, <u>StreetMediaGroup, LLC v. Stockinger</u>, 79 F.4th 1243, 1252 (10th Cir. 2023) ("Because the Act and rules are content neutral under Supreme Court precedent, we review under the intermediate scrutiny standard of review."); *Compare*, <u>Smith</u>, *supra* (Upholding a ban on solicitations on the Fort Lauderdale's beaches under intermediate scrutiny).

## B.   DAYTONA BEACH'S SOLICITATION ORDINANCE SURVIVES REVIEW UNDER INTERMEDIATE SCRUTINY.

Daytona Beach's panhandling Ordinance is subject to intermediate scrutiny because it is a location-centric regulation of solicitations which does not turn on the content of speech. An individual soliciting for political or religious purposes, or on behalf of a social cause, or for her own benefit, is treated exactly the same under the Ordinance. If that speaker asks the solicited party to give her something of value,

27

she is subject to §66-1 regardless of what the money or consideration is to be used for or whether the individual will benefit from the payment. If the speaker merely wishes to draw attention to the plight of the homeless, or if the speaker requests a donation of money at some future time or place, she can do so without any restrictions at all.

In this regard, §66-1 comports precisely with the Supreme Court's ruling in Austin. The City established a category of speakers subject to regulation - persons who engage in solicitation - recalling that the Court specifically held that "the First Amendment allows for regulations of solicitation". Austin, 596 U.S. at 72. The category of "solicitation" is obviously defined in terms of speech, and "[t]o identify whether speech entails solicitation, one must read or hear it first". However, Austin tells us that such ordinances are not content-based so long as they do not turn on what is said or who is doing the speaking. Id.[9]

Individuals who engage in solicitation, as defined in §66-1, are treated the same regardless of "topic, subject matter, or viewpoint". Id. The fact that charitable

---

[9] This is the point of departure between Austin and Reed. Under the earlier precedent, a category defined in terms of speech would be considered content-based even if the category did not distinguish between individual speakers or turn on the content of what was said. Thus, one could not regulate solicitors as a class under Reed, but such regulations are specifically permissible under Austin.

donations may be subject to the law more often than individuals soliciting other kinds of donations does not mean that the law is content-based. *See,* McCullen v. Coakley, 573 U.S. 464, 480 (2014) ("[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics.").

Time, place, and manner restrictions, such as §66-1, are subject to intermediate scrutiny and are typically reviewed under the three-part test announced in Ward v. Rock Against Racism, 491 U.S. 781 (1989):[10]

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (citations omitted).

Id. at 791.

Having erred from the start in concluding that §66-1 is content-based, the trial Court never considered any aspects of intermediate scrutiny, including the

---

[10]    There are numerous tests for intermediate scrutiny in cases such as Ward, O'Brien, and Renton. However, as a practical matter, these various tests all lead to the same result. *See, e.g.*, Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1291–92 (11th Cir. 2021) (Considering time, place, and manner restrictions and regulations of expressive speech before concluding that "[t]hese standards substantially overlap and yield the same result in this case."). For purposes of this litigation, the Ward or O'Brien time, place, and manner standards are the most appropriate.

substantiality of Daytona Beach's governmental interests. Instead, the Court applied strict scrutiny, mandating a compelling government interest. (Doc. 151 at 12). The trial Court devoted a scant two pages to the City's claims of a compelling government interest, identifying traffic safety and health hazards as the principle concerns. (Doc. 151 at 13).[11]

The Court engaged in almost no fact-finding and citations to the record are slim to none. (Id.) The Court's principle finding appears to be that the regulations were not tied to the actual risk of disease spread or traffic fatalities: "Defendant has offered no evidence showing that the asserted traffic safety or health concerns are greater in the areas affected by the Ordinance compared to other areas". (Id.) But that's just wrong. The record supports the common-sense conclusion that the risks are highest where the population of people and motor vehicles are highest. (Doc. 121-5 at 17-18, 147-48, 153, 167; 121-13 at 99-101; 121-26 at 37-38, 40; 121-33; 121-36 at 1, ¶ 5, 2, ¶¶ 9-10, 3, ¶ 12, 4, ¶¶ 17-18, 5-6, ¶¶ 27-29).

---

[11] The Court confused and conflated the evidence and arguments concerning three different provisions of §66-1: the locational restrictions on solicitations, the time-based regulation, and the prohibition against aggressive panhandling. (Doc. 151 at 13-14). Some of the Court's conclusions were based on underinclusivity and some on overbreadth, but it is not clear that the Court ever considered the issue of narrow tailoring which is key to understanding the Ordinance - particularly the location-based provision.

The Court also found that the Ordinance was underinclusive, applying the same level of strict scrutiny:

> The Traffic Provisions are underinclusive in that they restrict solicitations for charity but not solicitations regarding any other subject matter, which would pose the same threat to public safety and deployment of police or fire vehicles. (Doc. 151 at 14).

But that holding suffers from the same defect as the initial decision to apply strict scrutiny: it proceeds on the false assumption that the Ordinance only restricts "solicitations for charity" and not solicitations for other purposes.

Crucially, the trial Court failed to consider any of the substantial government interests which would support §66-1 under intermediate scrutiny. Those would include concerns such as traffic flow, the public health generally and promotion of local businesses and aesthetics, which courts have recognized as important, and significant interests which satisfy intermediate review. Neither did the Court engage with any of the tests for intermediate scrutiny set forth in <u>Ward</u> and related cases. Having concluded that the law was subject to strict scrutiny, the Court simply closed down any further inquiry.

While this Court does not have the benefit of the trial Court's thinking with respect to intermediate scrutiny, the text of the Ordinance and the record below bear out only one conclusion: the law is narrowly tailored to advance a substantial government interest. There is no question that the governmental interests set forth in

the predicate clauses of Daytona Beach's solicitation Ordinance and supported by

the comprehensive record at the enactment hearings are substantial:

> It is well settled that "a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." Heffron v. International Society For Krishna Consciousness, 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981). *See also* Messer v. City of Douglasville, Ga., 975 F.2d 1505, 1510 (11th Cir. 1992) (holding that "both traffic safety and aesthetics are substantial governmental goals"). As the Supreme Court stated, "[M]unicipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for the movement of people and property, the primary purpose to which the streets are dedicated." Schneider v. State of New Jersey, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

Int'l Caucus of Labor Committees v. City of Montgomery, 111 F.3d 1548, 1551

(11th Cir. 1997). The existence of even one substantial interest is sufficient to

support a regulation. *See*, Fla. Bar v. Went For It, Inc., 515 U.S. 618, 624, n. 1

(1995).

While the burden is on the government to show that it has adopted a narrowly

tailored law, it is not the business of the courts to second-guess reasonable legislative

decisions:

> To survive First Amendment scrutiny, a commercial speech prohibition must employ "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may

32

best be employed." Fox, 492 U.S. at 480, 109 S.Ct. at 3035 (quotations and citation omitted).

FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1299 (11th Cir. 2017); *See, also*, Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662 (1994), *quoting* Ward, *supra* ("To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. 'Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"); Board of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 478 (1989) ("[W]e have been loath to second-guess the Government's judgment…").

When it enacted §66-1, Daytona Beach relied in part on the legislative record and actual impacts of a very similar law enacted in nearby St. Augustine, Florida. The careful evaluation of St. Augustine's experience was important for two reasons. First, for purposes of narrow tailoring, it strongly suggests that location-centric regulations are an appropriate means of addressing societal problems with solicitations while showing sensitivity to speech interests. Secondly, St. Augustine's ordinance proved to be a superlative success in the real world by demonstrably curtailing the worst problems while keeping speech alive in that city. (Doc. 121-11; 121-12; 121-13 at 33-35, 78-82; 134-36).

33

It was entirely reasonable for the City of Daytona Beach to look at the experiences of other cities and the legislative solutions tried elsewhere to address a common problem. Indeed, case law shows that consideration of other ordinances is a bellwether for determining whether a local government has considered the impact of its regulations on speech. *See, e.g.*, Billups v. City of Charleston, S.C., 961 F.3d 673, 688 (4th Cir. 2020) (Ordinance governing tour guides was not narrowly tailored where city ignored voluntary tour guide certification program used by other local governments around the country); FF Cosmetics, 866 F.3d at 1300–01.

The record support for Daytona's efforts to craft a narrowly-tailored law is not limited to a study of St. Augustine's experience with panhandling. The City Commission heard and considered evidence from police officers, fire department personnel, public works employees and business owners and employees.[12] The City also heard from a medical doctor who reviewed the relevant scientific literature on the potential for the spread of disease. *See*, discussion, *infra*.

It is important to recognize that §66-1 does not ban panhandling. In fact, the Ordinance barely regulates it at all. Panhandling is permitted without any restrictions in some 97.5% of the City during all daylight hours. (Doc. 121-30 at 28-29). The

---

[12] The voluminous legislative record included four separate public hearings with 10 hours of testimony with 24 witnesses and is documented across a dozen exhibits submitted in opposition to the summary judgment motion (Doc. 121, Ex. 1-12).

areas where panhandling is regulated are closely tied to high-traffic areas in terms of vehicular or pedestrian movement. (Doc. 121-36 at 1, ¶ 5, 2, ¶¶ 9-10, 3, ¶ 12, 4, ¶¶ 17-18, 5-6, ¶¶ 27-29). Even there, a panhandler can bring attention to the plight of the homeless and encourage charitable giving so long as there is no immediate donation of money or consideration.

While the trial Court did not provide its thoughts with respect to intermediate scrutiny, it criticized the prohibitions against soliciting after dark and aggressive panhandling for not being closely linked to the asserted government interests. (Doc. 151 at 13-14). Again, the Court's findings are presented in conclusory fashion without any citation to the record. And again, the actual record contradicts the conclusions drawn by the trial Court. The City introduced evidence supporting its Ordinance with respect both to the temporal restriction (Doc. 121-2 at 82-83; 121-34 at 2-3, ¶¶ 17-19) and to the conduct regulation. (Doc. 121-32 at 2-4; 121-34 at 2-3).

Neither the trial Court nor the Plaintiffs suggested that §66-1 failed to provide alternative avenues of communication. Nonetheless, in the interest of completeness, Appellant will address that final prong of intermediate scrutiny. Given the variety of regulatory tools available to it, the City elected to regulate primarily by identifying the locations where panhandling had historically led to problems. As a result, those

few locations where panhandling is regulated are primarily limited to busy intersections where solicitations would present a danger to both drivers and panhandlers. Other locations where panhandlers are regulated under §66-1 include areas where pedestrians are concentrated at entranceways to businesses and public buildings and places where individuals may expect a degree of privacy or are captive audiences (such as at ATMs).

Each of these relatively few locations is closely tied to the City's substantial interests in protecting traffic flow, pedestrian safety, and promoting aesthetic values and, thus, satisfies intermediate review. Where that sort of tie-in is demonstrated on the record, courts must defer to the reasoned decisions of local legislators. *See, e.g.*, Jim Gall Auctioneers, Inc. v. City of Coral Gables, 210 F.3d 1331, 1333 (11th Cir. 2000) ("We see no reason to revisit the district court's finding that the City has a substantial interest in maintaining the aesthetics and tranquility of its residential neighborhoods, as well as in regulating traffic flow.").

The City ensured that sufficient alternative avenues of communication were available to solicitors, amounting to more than 97.5% of the City's geographic area. (Doc. 121-30 at 28-29). *Compare*, City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986) (Upholding adult entertainment zoning where only 5% of the city was available for those uses). The burden on speech here is slight. Plaintiffs can

36

either move a few feet to a lawful location to solicit money or they can engage in advocacy anywhere so long as they do not seek an immediate donation of money.

Section 66-1 of the Daytona Code satisfies intermediate scrutiny in all respects.

### C. EVEN IF DAYTONA BEACH'S SOLICITATION ORDINANCE IS CONTENT-BASED, IT SURVIVES STRICT SCRUTINY GIVEN THE COMPELLING GOVERNMENT INTERESTS ASSERTED AND THE NARROWNESS OF THE REGULATION.

To the extent that strict scrutiny applies, Daytona Beach's solicitation Ordinance has predicate clauses that assert compelling government interests coupled with a legislature record which fully documents those interests. Regulations can and do survive strict scrutiny where the interest is compelling and the law is carefully crafted:

> We have emphasized that "it is the rare case" in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest. Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion). But those cases do arise.

Williams-Yulee v. Fla. Bar, 575 U.S. 433 (2015).

Daytona Beach's carefully constructed plan to survive strict scrutiny appears to be unique among reported panhandling cases as local governments have generally conceded that their regulations cannot meet that standard. *Compare*, Henagan v. City

37

of Lafayette, 2022 WL 4546721 at *2 (W.D. La. Sept. 27, 2022) (City waived its right to challenge the level of scrutiny to be applied and neglected to explain how the law could survive even intermediate scrutiny); Homeless Helping Homeless, Inc. v. City of Tampa, 2016 WL 4162882 at *5 (M.D. Fla. 2016) (City conceded that its solicitation law was not supported by a compelling interest and did not employ the least restrictive means).

Preserving the public health is a compelling government interest. *See*, Regents of Univ. of California v. Bakke, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); Buchwald v. Univ. of New Mexico Sch. of Med., 159 F.3d 487, 498 (10th Cir. 1998) ("[P]ublic health is a compelling government interest…"); Lawrence v. Polis, 505 F.Supp. 3d 1136, 1144 (D. Colo. 2020) ("Whether it is deemed an 'emergency' or not, responding to a public health threat is undeniably a compelling government interest.").

In this case, Daytona Beach introduced expert testimony from Steven Miles, M.D., a knowledgeable physician, about the link between panhandling, open defecation and urination, and the spread of diseases which can cause severe illness and death:

12.    Assuming, as I was asked to do, that the evidence is going to show that panhandlers openly defecate and openly urinate, my conclusion is that exposure to such open defecation or urination in the City of Daytona Beach, including but not limited to the Boardwalk, would be significantly detrimental to the health of citizens and tourists, especially the old, young, and infirm.

13.    I have reviewed the ordinance and its regulations on panhandlers and at the time of the passage of the subject ordinance I recommended that considering the effect on the public health safety and welfare of the citizens and tourists of Daytona Beach, the City Commission should strongly consider passing the ordinance because if not, we're going to have an outbreak or problem.

(Doc. 121-33 at 3, ¶¶ 12-13).

When a panhandler reaches out his hand to take money or any article of value from a donor after openly defecating or openly urinating he is placing the donor at risk of disease and death.

(Doc. 121-38 at 5).

Dr. Miles' opinion was supported by medical literature documenting the diseases addressed in his Declaration. (Doc. 121-2 at 238-355; 121-3; 121-33). In addition, the unique link between panhandling and open defecation and urination was supported by numerous witnesses, including law enforcement, fire personnel, public workers, local business owners and their employees. (Doc. 121-26 at 44-45; 121-36 at 3-5; 121-24 at 37-38, 49-51, 63-66, 79-83; 121-31 at 4; 121-32 at 3-4;). Plaintiffs introduced no evidence to contradict either the existence or compelling nature of these proofs.

The City also identified traffic and pedestrian safety as a compelling interest served by its panhandling Ordinance. (Doc. 121-16, 121-17, 121-26, 121-27; Doc. 122 at 19-20). Other cases have confirmed that these interests may be deemed compelling:

> Traffic safety qualifies as a compelling government interest. *See*, *e.g.*, McLaughlin v. Lowell, 140 F.Supp. 3d 177, 190-91 (D. Mass. 2015); City of Baton Rouge, 876 F.2d at 497-98 (*citing* Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640 (1981).

Gbalazeh v. City of Dallas, Texas, 2019 WL 1569345 at *2 (N.D. Tex. 2019); *See, also*, Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1268 (11th Cir. 2005) ("We do not foreclose the possibility that traffic safety may in some circumstances constitute a compelling government interest…").

It is no great stretch to imagine that individuals regularly approaching cars at busy intersections expose themselves to extreme risks which the government may wish to ameliorate:

> 5.      One of the effects that I have seen of panhandling on the City of Daytona Beach is that panhandlers interfere with pedestrian safety. Panhandlers have been hit by cars and seriously injured.

> 6.      One example is of a panhandler named Kimberly Mason who was a habitual panhandler at Nova and Belleville. She distracted a driver and he did a complete 360 and ran her over on the median and hit two cars next to her.

(Doc. 121-36 at 1-2, ¶¶ 5, 6; Doc. 121-26 at 40, 47-48, 54-55, 58-59).

As noted above in the section addressing intermediate scrutiny, the trial Court assumed that these interests were compelling, but faulted the City for failing to link its interest to the particular regulations employed. In its summary judgment order, the Court dismissed Appellant's proofs without a single citation to the record. (Doc. 151 at 13-14). The trial Court simply ignored the City's extensive legislative history as well as Appellant's careful efforts to match each of its interests to that record. Furthermore, instead of employing the usual mode of analysis, addressing whether the government utilized the least restrictive means of regulation,[13] the trial Court embarked on a discussion of underinclusivity and over-inclusivity. While that inquiry is not strictly alien to First Amendment jurisprudence, it is simply not how the analysis generally runs.[14]

---

[13] The words "least restrictive means" never appear in the summary judgment order, although that it is universally known that this is the standard applicable to strict scrutiny cases. *See, generally*, Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 607 (2021) *quoting* McCullen v. Coakley, 573 U.S. 464, 478 (2014) ("Under strict scrutiny, the government must adopt "the least restrictive means of achieving a compelling state interest…").

[14] The doctrines of underinclusivity and over-inclusivity do not constitute independent constitutional violations. Rather, they are merely tools to determine whether a law is content-based. *See, generally*, Williams-Yulee v. Fla. Bar, 575 U.S. 433, 449 (2015) ("Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation'" (citation omitted)). Daytona's solicitation ordinance is not riddled with exceptions like those usually found when a law is underinclusive. *Compare*, Reed, *supra*.

41

Section 66-1 does, in fact, adopt the least restrictive means of regulation. Panhandling is regulated in the community, but is permitted in over 97.5% of the City, including many busy roads and commercial areas. (Doc. 121-30 at 28-29). The temporal restrictions are limited to nighttime hours when solicitation is rare and dangerous conditions exist. *Compare*, Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1365 (11th Cir. 1999) ("Since the rule also leaves open reasonable alternative avenues of expression - adult businesses may stay open fourteen hours a day, seven days a week - it is valid."). The only restriction on manner pertains to specifically defined "aggressive" panhandling, which addresses conduct rather than speech and is tailored so that it reaches only actions tantamount to an assault.

Daytona Beach demonstrated on this record that its ordinance advances a compelling state interest through the least restrictive means of regulation. At the very least, the extensive record and the conflicting evidence on certain key points merited a trial of this novel issue. Section 66-1 can satisfy the extraordinary burdens imposed by Reed, although it should be governed by the lesser burdens adopted by Austin.

## II.   THE TRIAL COURT ERRED IN ENTERING A SUMMARY JUDGMENT FINDING THAT DAYTONA BEACH'S SOLICITATION ORDINANCE VIOLATED THE FIRST AMENDMENT WHERE DISPUTED ISSUES OF CONSTITUTIONAL FACT REMAINED AS TO ALL OF THE CENTRAL ISSUES.

STANDARD OF REVIEW: The District Court's grant of summary judgment

is subject to *de novo* review by this Court. *See*, <u>Perez v. Owl, Inc.</u>, 110 F.4th 1296, 1301 (11th Cir. 2024). Because this case involves First Amendment issues, all "constitutional facts" are reviewed *de novo* and any "historical facts" are reviewed for clear error. *See*, <u>Warren v. DeSantis</u>, 90 F.4th 1115, 1126 (11th Cir. 2024)

The record facts are particularly important to a proper resolution of this novel legal question. The trial Court erred in entering a summary judgment in the face of bitterly disputed facts which centered on two elements which are key to the constitutional inquiry: narrow tailoring and the nature and sufficiency of the governmental interest.

The summary judgment standard is well known to this Court and can be repeated like a mantra: summary judgment is improper unless the moving party can show that there are no genuine issues of material fact, taking all of those facts and inferences in the light most favorable to the nonmoving party. *See*, Rule 56(c), <u>Fed.R.Civ.P.</u>; *See, also*, <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742–43 (11th Cir. 1996). "It is not the court's role to weigh conflicting evidence or to make credibility determinations…". <u>Id</u>.

The focus on disputed facts is especially important in a case like that before the Court. Plaintiffs brought a facial and as-applied First Amendment challenge against the City of Daytona Beach's Ordinance regulating solicitations along roadways and public areas. (Doc. 35 at 2, ¶ 6). Much of that dispute depends upon

43

whether §66-1 regulates on the basis of content and is therefore subject to strict scrutiny or whether the law is content-neutral and subject only to intermediate scrutiny. However, the content-neutrality question is only the first step in the constitutional analysis.

Even in cases applying strict scrutiny, there are additional questions that must be answered in order to determine whether a law violates the First Amendment. After all, labeling a law as content-based does not automatically mean that it is unconstitutional. Rather, this Court must still consider whether the law utilizes the least restrictive means of regulation and whether it advances a compelling governmental interest. *See*, Reed, 576 U.S. at 163 ("To satisfy strict scrutiny the government must prove that the law is "narrowly tailored to serve compelling state interests."). Laws can and do survive that level of judicial scrutiny. *See, e.g.*, Williams-Yulee, 575 U.S. at 454 (Ban on personal solicitations by judicial candidates was upheld against a First Amendment challenged under strict scrutiny); Matter of Subpoena 2018R00776, 947 F.3d 148 (3d Cir. 2020) (Non-disclosure order in context of a grand jury witness subpoena upheld under strict scrutiny even though order was both content-based and a prior restraint).

Intermediate scrutiny is also firmly grounded in the specific facts of a case. While the details vary slightly depending upon the particular application, all of the

Supreme Court's cases involving intermediate scrutiny require the application of a multi-factor test. *See,* Ward, *supra.* Intermediate scrutiny involves a balancing act between the government's interest in advancing its objectives and the impact or burden on potential speakers. *See, generally*, Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton, 536 U.S. 150, 165 (2002) ("We must also look, however, to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve."); *See, also*, United States v. Jimenez-Shilon, 34 F.4th 1042, 1053 (11th Cir. 2022) (J. Newsom concurring) ("Here, as best I can tell, is where things stand in terms of First Amendment doctrine… In between, it's balancing tests all the way down."). This is an intensely factual inquiry making summary judgment inappropriate in many such cases. *See, e.g.*, Bruni v. City of Pittsburgh, 941 F.3d 73, 91 (3d Cir. 2019) (Determining whether a challenged regulation is narrowly tailored is ordinarily a "rigorous and fact-intensive inquiry.").

Courts examine whether there are other, less restrictive laws regulating the same subject matter in that community or elsewhere. *See, e.g.*, Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1296 (11th Cir. 2021) (Existence of less restrictive regulation in Orlando suggests that Fort Lauderdale's ordinance was not narrowly tailored); FF Cosmetics, 866 F.3d at 1300–01 (City use

of permitting scheme to regulate charities, artists, and vendors provided ready examples of less restrictive alternative to ban on commercial solicitations). Courts also consider likely alternatives suggested by the record to determine whether there are other, obvious, but less burdensome solutions to the government's problems. *See, e.g.*, Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 639 (1980) (Prohibition against door-to-door canvassing was not narrowly tailored given enforceability of private "no trespassing" signs which allow individualized determinations). Those are factual inquires based on admissible evidence developed in the record.

As the moving party, it was the Plaintiffs' burden to demonstrate the *absence* of any disputed issues of material fact. *See*, Baas v. Fewless, 886 F.3d 1088, 1091 (11th Cir. 2018). The City maintains that the Plaintiffs never met their burden. In any event, the City undertook the task of identifying specific issues of disputed fact which were thoroughly documented with citations to the record. Dozens of individual facts were identified which were divided into multiple categories relevant to the constitutional inquiry. Those categories included such crucial matters as:

1.    Whether Plaintiffs had demonstrated standing.

2.    The nature of the governmental interest, including compelling and/or substantial concerns about the spread of disease, fatal traffic accidents and injuries,

pedestrian safety, the public health generally, promotion of local businesses and aesthetics.

3. Whether the government interest is likely to be advanced by the regulation chosen and how similar ordinances have fared in similar communities.

4. The degree to which speech is actually burdened by the measure.

5. The crucial issue of narrow tailoring, including such factual questions as the geographic scope of the ordinance, alternative means of regulation potentially available or actually employed in other communities, and whether the government's interests could be met with a lesser restriction. (Doc. 122 at 3-7).

Appellant specifically identified the witnesses who would testify to those disputed facts and listed those documents it would rely on to prove those disputed facts. (Doc. 122 at 3-7; Doc. 141; Doc. 147) Appellant also explained in great detail why those facts mattered for this case and why they would matter even if strict scrutiny applied. (Doc. 122 at 14-20). Unlike the vast majority of defendants in First Amendment litigation, the City of Daytona Beach was fully prepared to defend its Ordinance on the facts under a strict scrutiny regime. (Doc. 122 at 14-20).

To be clear, these were disputed facts. For instance, one of the most basic issues in these cases is the burden which is placed on speech. When a law is based on geography, as the Daytona Beach solicitation ordinance is, the question is phrased

in terms of "alternative avenues of communication". *See*, <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41 (1986). The City maintained that §66-1 left as much as 97.5% of the City open to essentially unrestricted solicitations. (Doc. 121-30 at 28-29). The City argued below and the record shows that, in most instances, the Plaintiffs could comply with this law by literally moving a few feet to legally panhandle (Doc. 122 at 18).

Plaintiffs offered a starkly different view of the impact of this law. Plaintiffs maintained that the Ordinance limited solicitations to 31.9 % of the City. (Doc. 107-1). Plaintiffs claimed that, as a factual matter, the solicitation imposed a veritable ban on solicitations both in terms of geography and their ability to interact with their intended audience. (Doc. 108 at 15, 20)

Both parties relied on expert witnesses to address the issue of alternative avenues. (Doc. 107-1; 109-1; 109-2; 110-2; 121-30). Both parties challenged the credentials and methodology of the other's expert reports through <u>Daubert</u> motions. (Doc. 107, 109, 110). These are disputed factual issues - hotly, fiercely, and zealously disputed. *See*, <u>Hodosh v. Block Drug Co., Inc.</u>, 786 F.2d 1136, 1143 (Fed. Cir. 1986) ("The fact issues herein must be resolved by trial in which the conflicting views of the experts will be subject to the refining fire of cross examination…."); *See, also*, <u>State Nat. Ins. Co. v. Cnty. of Camden</u>, 10 F. Supp. 3d 568, 579 (D. N.J.

2014) ("These dueling experts alone preclude the entry of summary judgment."). The outcome of this case necessarily turns on the resolution of these disputed facts as they lie at the core of the constitutional inquiry.

The same is true of the facts most important to the City's claim that its law survives strict scrutiny review. Daytona Beach developed an extensive legislative history showing that personal solicitations - particularly those in which paper money, food or goods are donated - represent a direct threat to the public health through the spread of disease. (Doc. 121-2 at 27-54; 121-5 at 172; 121-22; 121-23; 121-33; 121-38). The City tailored its regulation to specifically counter that threat without unduly burdening speech. (Doc. 121-13 at 78-82; Doc. 122 at 2, 5). The City did this by limiting its regulation only to those solicitations which posed the greatest risk - immediate requests for the donation of money or items of value - and only to those locations which presented the greatest threat - the most crowded intersections in the community. (Doc. 122 at 17: "The areas where panhandling is regulated are closely tied to high-traffic areas in terms of vehicular or pedestrian movement.").

Plaintiffs claimed that there was little or no factual basis for the City's concern about disease and that the deaths and injuries arising from interactions between solicitors and vehicles were statistically uncommon. (Doc. 108 at 7). Again, this aspect of the parties' dispute did not center on case law or high constitutional

principles. Rather, it was a dispute based on the factual record and the conclusions one could draw from those facts.

The City's justification based on public health and safety also revolved around dueling expert opinions. The City proffered the opinion and testimony of Dr. Steven Miles who provided support for Appellant's factual claim that solicitations pose a unique threat to the public health through the spread of specific diseases.  (Doc. 109-2; 121-22; 121-33 at 3, ¶¶ 12-13). Dr. Miles' evidence also supported the City's view that regulating solicitations through locational restrictions was an appropriate means of advancing the governmental interest. (Doc. 121-22 at 94, 99; 121-23 at 21; 121-33 at 2-3; 121-33; 121-38).

Plaintiffs offered the opinions of Dr. Pedro Greer who would testify that solicitation ordinances adversely impact homeless people. (Doc. 121-37 at 3). Dr. Greer was also of the opinion that some of the disease organisms identified by the City's expert as posing a threat to the public health do not survive long on exposed surfaces in a high humidity environment. (Doc. 121-37 at 3).

Other than summarily denying the existence of disputed facts, the trial Judge did not engage in fact finding at all. Instead, the Judge determined that the law was content-based, applied strict scrutiny and largely proclaimed the record facts irrelevant to that inquiry. (Doc. 151 at 13-14). But the facts are never irrelevant to

constitutional questions.

The trial Court is entitled to no deference when it comes to reviewing those core, constitutional facts. That is true because the issues which matter in this case, and the issues where are identified as disputed by the City, are "constitutional facts".[15] Where constitutional facts are at play, reviewing courts examine the record *de novo* and reach their own determinations:

> [O]ur review of petitioners' claim that their activity is indeed in the nature of protected speech carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court. *See* Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984). … This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection.

Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 567–68 (1995).

This Court has whole-heartedly embraced the special treatment afforded "constitutional facts". *See*, Warren v. DeSantis, 90 F.4th at 1126, *quoting* Am. Civil Liberties Union of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1203

---

[15]    Constitutional facts are the "core facts" that determine whether a First Amendment violation has occurred. *See*, Otto v. City of Boca Raton, Florida, 41 F.4th 1271, 1273 (11th Cir. 2022).

(11th Cir. 2009) ("'Where the First Amendment Free Speech Clause is involved,' we review 'constitutional facts' de novo."). The *de novo* review of constitutional facts extends in particular to the questions of narrow tailoring and advancement of the governmental interest. *See*, ACLU of Fla., Inc., 557 F.3d at 1205 (11th Cir. 2009), *quoting* Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 n. 9 (11th Cir. 1987) ("'[W]hether a commercial speech regulation directly advances the government's goals or is more extensive than necessary' is a constitutional fact that we were required to decide for ourselves.").

The inquiry devolves into the question of "why" the City chose this particular regulation to advance this particular interest. *See*, Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc., 942 F.3d 1215, 1229 (11th Cir. 2019) *quoting* ACLU of Fla., Inc., at 1206 *supra* ("Historical facts deal with 'the who, what, where, when, and how of the controversy,' while constitutional facts are the 'why' facts that relate to 'intent' or 'motive.'" (quotation marks cleaned up)); *Compare*, Valadez v. Paxton, 2023 WL 6536246 at *4 (W.D. Tex. 2023), *report and recommendation adopted*, 2023 WL 6159822 (W.D. Tex. 2023) (Declining to enter summary judgment in intermediate scrutiny case because: "Both sides have presented experts and a litany of evidence to support their positions. A trial - not summary judgment motions - is the better vehicle to resolve these issues.").

The trial Court would have benefitted from a trial to explore all of the issues suggested by these disputed facts regarding both intermediate review and strict scrutiny - particularly with respect to standing,[16] narrow tailoring and the substantial or compelling nature of the government interests asserted. A complete record developed through a trial, where witnesses are challenged and attorneys are called upon to explain their positions in light of actual facts applied to actual litigants, would advance the law in a way the present decision does not.

This is an important case. It is not just that the application of <u>Reed</u> to solicitation ordinances takes on a novel gloss in light of <u>Austin</u>. Panhandling ordinances are common across America because the problems caused by unregulated solicitations are legion. In the wake of the Supreme Court's decision in <u>Reed</u>, ordinances broadly similar to Daytona Beach's have been routinely - perhaps

---

[16]    Standing was disputed with respect to two matters: whether Plaintiffs ever panhandled at night and whether they ever engaged in "aggressive panhandling." Plaintiffs did not allege in their original Complaint that they ever panhandled at night (Doc. 1). It was only after Appellant challenged their standing that a perfunctory allegation appeared in the Plaintiffs' Amended Complaint. (Doc. 35 at 19, ¶ 93, 20-21, ¶ 106, 22, ¶ 119). Plaintiffs' discovery responses stated, without elaboration, that they "sometimes" panhandled at night. (Doc. 108-1, 108-2, 108-3). Discovery also showed the Plaintiffs denied ever panhandling in an aggressive manner. *See, e.g.*, Doc. 108-4 at 10 ("Plaintiff has not engaged in "aggressive panhandling" as that term is defined in §66-1…"). A trial would have allowed Appellant to properly test Plaintiffs' standing to challenge the corresponding portions of §66-1.

53

universally - declared unconstitutional. The resolution of this appeal will determine whether local governments must give up panhandling ordinances as part of their repertoire for addressing social problems or whether a reasonable balance can be reached between society's needs and the speech rights protected by the First Amendment.

## **CONCLUSION**

Daytona Beach's panhandling ordinance is a content-neutral means of addressing a compelling problem faced by many local governments. In past years, similar ordinances were universally stricken in reliance on the Supreme Court's decision in Reed, which treated any law requiring the examination of what a speaker says as intrinsically content-based and subject to strict scrutiny. The Supreme Court receded from Reed in Austin. In Austin, the Court specifically stated that solicitation ordinances are *not* content-based so long as they do not discriminate based on topic, subject matter, or viewpoint. In other words, regulating a category of speech, such as solicitations, does not automatically subject a law to strict scrutiny.

Daytona Beach's ordinance does not turn on topic, subject matter or viewpoint. Instead, *all* persons seeking an immediate donation of money or other item of value are subject to the regulation regardless of who they are, what they say or the purpose of the solicitation. Accordingly, §66-1 is subject to intermediate scrutiny, which it easily satisfies. Indeed, the law is supported by compelling government interests that would survive strict scrutiny.

The trial Court erred in granting summary judgment in the face of hotly disputed facts and erred in applying strict scrutiny to a content-neutral law. The decision should be reversed outright on this record or remanded for a trial.

Respectfully submitted,

  /s/ Michael H. Kahn
Michael H. Kahn, Esquire
Florida Bar No.: 0241921
MICHAEL KAHN, P.A.
482 N. Harbor City Blvd.
Melbourne, FL 32935
(321) 242-2564
Lead Counsel for Defendant
The City of Daytona Beach, Florida
Michael@michaelkahnpa.com
Roma@michaelkahnpa.com
Assistant@michaelkahnpa.com

Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed.R.App.P. 28.1(e)(2) or 32(a)(7)(B) because this Brief contains 12,993 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using MS Word 2013 in Times New Roman 14 point font.

  /s/  Michael H. Kahn
Michael H. Kahn, Esquire
Florida Bar No.: 0241921

## **CERTIFICATE OF SERVICE**

I certify that on November 26, 2024, I electronically filed this brief with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

/s/  Michael H. Kahn

Michael H. Kahn, Esquire
Florida Bar No.: 0241921